JACKSONWHITE
ATTORNEYS AT LAW
*A Professional Corporation*

40 North Center Street, Suite 200
Mesa, Arizona   85201
Telephone No.:      (480) 464-1111
Facsimile No.:      (480) 464-5692
Email:       centraldocket@jacksonwhitelaw.com
*Attorneys for Plaintiffs*
By:     Michael R. Pruitt, SBN 011792
         Email:       mpruitt@jacksonwhitelaw.com
         Nathaniel J. Hill, SBN 028151
         Email:       nhill@jacksonwhitelaw.com
         Grant S. Cragun, SBN 034332
         Email:       gcragun@jacksonwhitelaw.com

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Michelle Young, MA, a married woman filing individually; Dawn E. Conley, Ph.D., a single woman; and Candice Ross, DMA, a single woman,<br><br>Plaintiffs,<br><br>v.<br><br>Central Arizona College, also known as Pinal County Community College District,<br><br>Defendant. | Case No.:  CV_____<br><br>**COMPLAINT**<br><br>(Violation of Title VII of the Civil Rights Act of 1964, as amended; Retaliation in Violation of Title VII; Violation of 42 U.S.C. § 1981<br><br>(*Jury Trial Requested*) |

     Plaintiffs, Michelle Young, MA, Dawn Conley, Ph.D., and Candice Ross, DMA, by and through their counsel undersigned, and for their Complaint, allege as follows:

### INTRODUCTION

     1.     Plaintiffs are African-American females.  All Plaintiffs are either currently or formerly employed by Central Arizona College, also known as Pinal County Community College District ("CAC").

2.      Plaintiffs have all performed their job duties with CAC at or above satisfactory levels.

3.      Despite acceptably performing their jobs, all Plaintiffs have been subjected to a hostile work environment and other illegal acts of discrimination, based on their race, and have been subjected to retaliation for engaging in protected activities.

## I.      NATURE OF CLAIM

4.      This is a proceeding for damages against Defendant CAC to redress the deprivation of rights secured to Ms. Young by Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 2000e *et seq*., retaliation in violation of Title VII, and to all Plaintiffs by 42 U.S.C. § 1981.

## II.      JURISDICTION

5.      The events giving rise to these causes of action occurred in Pinal County, Arizona within the jurisdiction of this Court.

6.      The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331, pursuant to The Civil Rights Act of 1964 (Title VII), as amended and modified, 42 U.S.C. §§ 2000e *et seq*., and 42 U.S.C. § 1981.

## III.      VENUE

7.      Based on 28 U.S.C. § 1391, Title VII, and 42 U.S.C. § 1981, venue is proper because the acts detailed in this Complaint occurred within the State of Arizona and the jurisdiction of this Court.

## IV.      PROCEDURAL REQUIREMENTS

8.      Pursuant to 42 U.S.C. § 2000e-5(b), on October 1, 2020, Ms. Young filed a charge of discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") alleging a hostile work environment and race and color discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended.  On January 29, 2021, the EEOC issued Ms. Young a Notice of Right to Sue.  Ms. Young has therefore filed a timely charge of discrimination, received a right to sue letter, and satisfied all procedural requirements necessary to bring this action.

## V.     PARTIES

9.     Plaintiff Ms. Young has been employed by CAC since August 2010.  Ms. Young began working for CAC as an Adjunct Professor.  In or around August 2012, Ms. Young accepted a full-time position as a Professor of Communication Studies.  In April 2015, Ms. Young also began serving as the Director of the Ombudsman Program at CAC in addition to her regular position as Professor of Communication Studies.  She served in the position as Director of the Ombudsperson Program until June 30, 2020.  Additionally, in 2015, Ms. Young became lead faculty in the Communications Academic Division.  This was a three year appointment.  Ms. Young continues in her position as a Professor of Communication Studies at CAC.

10.     Plaintiff Dr. Conley has been employed by CAC since August 2014.  Dr. Conley works for CAC as a Professor of Sociology.

11.     Plaintiff Dr. Ross worked for CAC from June 6, 2016 to July 1, 2019.  Dr. Ross began working for CAC as an Executive Director.  Later, she was recommended by her supervisor, Chris Wodka, and promoted to a position as Chief Information Officer.  She remained in her position as Chief Information Officer until her termination on July 1, 2019.

12.     Ms. Young is, and at all times relevant to this action has been, a resident of Arizona residing in Pinal County, Arizona.

13.     Dr. Conley is, and at all times relevant to this action has been, a resident of Arizona residing in Maricopa County, Arizona.

14.     Dr. Ross is, and at all times relevant to this action has been, a resident of Arizona residing in Pinal and Pima Counties, Arizona.

15.     Defendant CAC is a community college organized and operating under the color of state law as a political subdivision of the State of Arizona pursuant to A.R.S. § 15-1401, *et seq.*

/ / /

16.     Defendant CAC is a college in Pinal County, Arizona.  CAC is overseen by the Pinal County Community College Governing Board, which contains five districts. CAC has five campuses and three centers located throughout the county.

17.     Defendant CAC is an employer of 15 or more employees and is therefore defined as an "employer" with respect to Title VII of the Civil Rights Act (42 U.S.C. ¶ 2000, *et seq.*).

18.     Ms. Young was an "employee" as defined by 42 U.S.C. § 2000e(f) and interpretive cases and authorities.

## VI.     FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

### A.     Plaintiffs have been subjected to a hostile work environment and suffered race discrimination and retaliation.

19.     African-Americans make up a small minority of employees at Defendant CAC.

20.     Under the current CAC Administration, many African-American CAC employees have been subjected to racial stereotypes, a hostile work environment, and discriminatory actions.

21.     Many of the African-American employees who have complained about their treatment and working conditions at CAC have been subjected to unlawful retaliation.

22.     Many African-American employees of CAC are demeaned and are made to feel like second class citizens.  CAC has condoned and permitted behaviors which:

    a.     support an abuse of power against African-American employees;

    b.     negatively affect African-Americans in the hiring and promotional processes;

    c.     fail to hold non-African-American employees accountable for inappropriate actions taken against African-American employees;

    d.     foster ignoring or downplaying the accomplishments and positive performance of many African-American employees;

     e.      overemphasize, over criticize, and overreact to perceived deficiencies of African-American employees; and

     f.      exclude or restrict African-American employees from the same opportunities offered non-African-American employees.

23.     Defendant CAC's own policies are deficient in ensuring a safe, hospitable, and comfortable work environment for African-American employees, and Defendant CAC does not fairly enforce the policies it does have to combat the divisiveness against African-American employees.

24.     Defendant CAC is well aware of the toxicity of culture and leadership at CAC, which negatively affects African-American employees, having seen years of employee surveys that paint an unflattering picture of the serious challenges that exist with CAC.

25.     Defendant CAC is also well aware of the many African-American employees, three of whom are Plaintiffs in this lawsuit, who have informed administration about  the challenges and difficulties of being African-American employees working for CAC.

**1.     Dr. Candice Ross**

26.     Almost immediately following her hire, Dr. Ross received several unwelcoming communications from one or more CAC employees.  Approximately one week after Dr. Ross began working at CAC, a copy of an organizational chart of the technology department at CAC with her name blotted out in red ink, mimicking blood, was surreptitiously placed under her office door.  Other unwelcoming notes of a harassing and threatening nature were also received.

27.     Dr. Ross was shocked by the notes and felt that she was targeted because of her race.  Dr. Ross reported this and several other notes she had found under her office door to Brandi Bain, Vice President Human Resources.  Upon information and belief, no meaningful investigation was conducted and no person was disciplined for engaging in such unwelcome and hateful behavior.

28.     In or around September 2016, a team of IT staff were at CAC's San Tan campus performing needed work.  The team had split up to accomplish the work.  A recently hired African-American male IT employee, Darryl McDaniel, who was part of the team, was approached by a faculty member and interrogated about what he was doing and told that he did not belong there.  Mr. McDaniel professionally and politely explained to the faculty member that he worked in the IT Department at CAC and he and several other members of the IT Department were there that day to perform needed work.  The faculty member told Mr. McDaniel to find his group and not to "wander the campus." Believing he was targeted because of his race, Mr. McDaniel reported this incident to Dr. Ross.

29.     Dr. Ross promptly reported the incident to her supervisor, Chris Wodka, Vice President Business Administration.  Dr. Ross asked Mr. Wodka if the IT Department could have shirts identifying them as IT Department staff to wear so this hopefully would not occur again in the future.  Mr. Wodka responded and agreed that this should not have occurred.  He also approved shirt rentals for the IT Department staff; however, when Dr. Ross submitted a request for the shirts, Mark Salaz, Procurement Director, initially refused to acquire the shirts.

30.     In September 2016, as part of her job duties and authority, Dr. Ross revamped the College Service Desk and arranged to move support services representatives from an inside room with a lock to a room where they would be visible to the public, students, and faculty.  Her objective was to make the support services representatives more visible and accessible.

31.     Some support services personnel disagreed with the move, preferring the more private and secluded location instead of an office accessible to the public, students, and faculty.  One support services representative, in fact, reportedly quit his job because of the move.  This individual complained to Brandi Bain, Human Resources, regarding Dr. Ross and was very threatening against her personally.

32.     Due to the nature of the complaint and threat against Dr. Ross, Ms. Bain asked Chief of Campus Police McKinney to escort Dr. Ross to her car that evening.  Ms. Bain told Dr. Ross that she would not go into the details of what the employee had said about Dr. Ross, saying only that it was "too derogatory to repeat."  Chief McKinney and CAC did nothing to respond to the threats except to offer to escort Dr. Ross to her car that evening.  Dr. Ross felt targeted and unprotected by CAC and believes that more would have been done to protect her by CAC if she had not been African-American.

33.     In August 2017, due to some negative feedback on a Campus Climate Survey, the President of CAC, Dr. Jacquelyn ("Jackie") Elliott, asked that each administrative department and members of faculty travel to each campus and talk about their areas and allow students to ask questions.

34.     On August 23, 2017, Dr. Ross, the IT Department, and faculty had their first meeting at one of the campuses.  Following the meeting, Michelle Kannegaard, Director Support Services and Online Learning, and Tammi Swade, Coordinator of Scheduling Solutions, told Dr. Ross that prior to the start of the meeting some faculty members were speaking in the parking lot and a comment had been made about "lynching Dr. Ross."  Upon further questioning, Ms. Kannegaard and Ms. Swade told Dr. Ross that Sue Tatterson, Professor of Digital Media and Digital Media Arts Program Coordinator, commented that the meeting was going to be "a good old-fashioned lynching."  Dr. Ross was shocked by the comment.  Later, Tammi Swade reported the comment to Chief McKinney several times.  However, nothing effective was done regarding her report.  Ms. Swade also attempted to report the comment to the President of CAC, Dr. Elliott, to no avail.

35.     Ms. Tatterson's comment was extraordinarily offensive and threatening to Dr. Ross.  The historical notoriety of this heinous practice against African-Americans could not have been mistaken or misunderstood by the speaker or CAC.

/ / /

36.     Dr. Ross reported the "lynching" statement to her supervisor, Mr. Wodka, both verbally and in an email.  However, nothing effective was done regarding her report, consistent with prior CAC practice, and no action was taken.

37.     The incident was also reported to Brandi Bain, Human Resources.  Dr. Ross spoke to Ms. Bain and asked if she was investigating the incident.  Ms. Bain responded only that she had asked Ms. Tatterson if she had made the statement that the meeting was going to be a good old-fashioned lynching and Ms. Tatterson denied making the statement. Ms. Bain stated that Ms. Tatterson's denial ended the investigation.  Remarkably, no other individuals present during the conversation or who may have overheard the conversation were questioned as part of the investigation.

38.     In November 2018, Brandi Bain, HR, informed Dr. Ross that she was being investigated.  When Dr. Ross questioned Ms. Bain why she was being investigated, Ms. Bain told her that she did not need to worry about it.  Ms. Bain said that the constituency groups that complained did not follow college policy and procedure for filing a grievance. Ms. Bain also told Dr. Ross that CAC was hiring an outside investigator to investigate the complaint.  Dr. Ross asked Ms. Bain why the College would need an outside investigator if the constituency groups had not followed procedure.

39.     Sometime between September and November 2018, Ms. Young spoke with Ms. Bain and expressed concerns that there was an effort to orchestrate Dr. Ross's discharge because there was animosity towards her and unhealthy behaviors by a few employees, which Ms. Young believed were because of Dr. Ross' race.  Ms. Bain told Ms. Young that a vote of no confidence had been made against Dr. Ross by the constituency presidents, none of whom were African-Americans.

40.     Ms. Young asked Ms. Bain why the vote of no confidence had happened and if the complaint was well-founded.  Ms. Bain responded that the complaint would be brought to a third party and that Dr. Ross had no previous grievances against her.  Ms. Young asked if this was standard procedure and expressed that she thought there was an ulterior motive on the part of those who complained, suggesting Dr. Ross' race motivated

the actions against her.  Ms. Bain responded, "let's just do the investigation and see what happens."

41.     After speaking to Ms. Bain and learning about the complaint of no confidence against Dr. Ross, Ms. Young spoke to the Faculty Senate President Clark Vangilder.  Ms. Young asked Mr. Vangilder how a vote of no confidence could occur against Dr. Ross with no vote by the faculty.  Mr. Vangilder responded that initially it was going to be a vote of no confidence, but it was changed to a formal complaint to prevent a vote from being taken.  Mr. Vangilder told Ms. Young that the faculty did not have enough complaints to bring forward an issue, but when he met with the other constituency group presidents (all white males), they were able to come up with enough complaints to "put something forward."

42.     Mr. Vangilder also told Ms. Young that President Elliott suggested that they bring forward the complaint.  According to Mr. Vangilder, Dr. Elliott said that she was tired of getting complaints about IT and she needed something formally in writing to address the issue.  Ms. Young asked Mr. Vangilder what was the intent of the complaint. He responded, "to get her [Dr. Ross] out of here" and hopefully it will be done by December so she would not start up the next semester.  Ms. Young expressed to Mr. Vangilder that she thought the way this was being done was very unprofessional and she was most concerned about the civility of the actions.  Ms. Young told Mr. Vangilder that she hoped the intent was with pure motives and that the upmost concern for civility be considered.

43.     Ms. Young next spoke with Mr. Wodka, Dr. Ross' direct supervisor.  Ms. Young asked Mr. Wodka if he supported the claims against Dr. Ross.  Mr. Wodka responded that he did not and was concerned that most of the charges were hearsay and bogus.  Mr. Wodka told Ms. Young that the complainants "should have done their research."  Ms. Young expressed that she felt Dr. Ross was being unfairly treated because of her race and she felt Dr. Ross' civil liberties were being violated.  Mr. Wodka stated

that he was confident Dr. Ross had not done anything wrong, that he had no issues with her performance, and that he would support Dr. Ross through the process.

44.     Later, after learning that Dr. Ross' complaint would be sent to a third party outside investigator, Ms. Young spoke with Dr. Elliott and Ms. Bain and expressed again that she felt that Dr. Ross was being treated unfairly and possibly discriminatorily.  Ms. Young told Dr. Elliott and Ms. Bain that she had talked to one of the constituency presidents who told her that the intent of the complaint was to get Dr. Ross fired and that she felt that Dr. Ross was being treated more harshly and unfairly than other similarly situated employees.  Both Dr. Elliott and Ms. Bain responded that the investigation should reveal the truth and they had an obligation to look into the complaint.  Ms. Young asked if the outside investigation was standard procedure and both Dr. Elliott and Ms. Bain responded, "yes."  In fact, it was not standard procedure.

45.     In June 2019, after more than six months of an alleged investigation of her, Dr. Ross was informed by Ms. Bain that her contract was not being renewed for the following school year due to alleged HIPAA violations.  When Dr. Ross asked what the HIPAA violations were, Ms. Bain responded that there were other reasons for not renewing her contract as well.   Ms. Bain gave Dr. Ross a letter terminating her employment and she, along with campus police, escorted Dr. Ross to her office and then to the campus parking lot.

46.     Two weeks prior to her dismissal, Dr. Ross asked her supervisor, Mr. Wodka, if she was going to be terminated because she was hearing rumors that she would be.  Mr. Wodka assured Dr. Ross that she was not going to be terminated and that he would be upfront with her about any dismissal.  Two weeks later, Dr. Ross was terminated without any warning.

47.     Dr. Ross' employment was terminated because of her race and in retaliation for her protected activities.

48.     Several months before her termination, Dr. Ross met with CAC's Diversity and Inclusion Committee ("the Committee"), which had been recently formed at the

College, and shared her concerns that the investigation regarding her was unfair, biased, and outlandish.   Following this meeting, the Committee asked Ms. Young, as the Ombudsperson, to schedule a meeting for the Committee with the College President, Dr. Elliott, to express their concerns with the investigation process and how Dr. Ross had been treated.  Ms. Young sent an email to Dr. Elliott and Ms. Bain requesting an opportunity to discuss the issues regarding Dr. Ross' treatment.

49.     Dr. Elliott and Ms. Bain refused to meet with the Committee and referred the Committee to the third party investigator to share any concerns.  Later, Ms. Young was contacted by the third party investigator to find out what were the issues that the Committee wished to share.  Ms. Young submitted a statement of concern on behalf of the Committee; however, there was no acknowledgment, no interview with the committee members, or follow up regarding the concerns expressed.

50.     Upon information and belief, no other similarly situated, non-African-American employees who have engaged in similar alleged behaviors have been similarly investigated and discharged as was Dr. Ross.

51.     Beginning in August 2019, following Dr. Ross' termination, hostility toward African-American employees at CAC intensified.  Ms. Young and Dr. Conley witnessed meetings where cheering and very unprofessional taunting by Caucasian employees was displayed, celebrating that Dr. Ross, an African-American Administrator, was no longer working at CAC.  Such behavior tacitly if not directly encouraged and exacerbated a hostile work environment for African-American employees and created a high degree of fear of retaliation for engaging in protected activities.  As Ombudsperson, Ms. Young received multiple complaints from African-American CAC employees who did not feel valued, protected, or safe in their work environment at CAC.

## 2.     Dr. Dawn Conley

52.     On August 12, 2019, during a Faculty Senate Constituency meeting, there was applause and loud cheers from faculty and chuckling from the Faculty Senate President when it was mentioned that a Black woman, Dr. Ross, was not returning to CAC.

Dr. Conley was highly offended by the unprofessional and hostile behaviors of the Faculty Senate and Faculty Senate President.

53.     Prior to the August 12, 2019 Faculty Senate Constituency meeting, Dr. Conley requested that she be allowed to raise a concern during the meeting that was relayed to her by a parent of a female student regarding the student's physical safety with her roommate at CAC.  When it was Dr. Conley's turn to speak, she started by emotionally and candidly expressing concern that she did not feel valued as a Black person or Ph.D. working at CAC because of what she just witnessed.  Dr. Conley then related the parent's safety concern.  Dr. Conley stated that she was informed by the parent that the parent had previously called CAC about her concerns regarding her daughter and left messages, but her calls were not returned.  Later, the parent was told that her calls were not returned due to The Family Educational Rights and Privacy Act ("FERPA").  Dr. Conley told the Faculty Senate that she was going to tell her students on the first day of school that they might want to fill out a FERPA waiver for the school listing a loved one or someone who they would want to be contacted in the event of a safety concern at school.

54.     Following this meeting, Dr. Conley was victimized and retaliated against by several white employees because of her protected statements made during the Faculty Senate Constituency meeting.  Dr. Conley was lied about, misrepresented by members of the faculty and Administration, and her reputation tarnished, while nothing was done concerning the mistreatment.  The day after the Faculty Senate Constituency meeting, Dr. Conley received an email from Dr. W. Tramaine Rausaw, Dean of Student Life, a male African-American, stating that he was told Dr. Conley had stated during the meeting that the parent concerned about her daughter had attempted to contact him, which was not true. Dr. Conley never mentioned Dr. Rausaw's name during the meeting.  When Dr. Conley asked Dr. Rausaw from whom he had heard this, he responded that someone who had been in attendance at the Faculty Senate Constituency meeting the day before had brought the matter to the attention of his supervisor, Dr. Jenni Cardenas, Vice President Student

Services.  Dr. Conley was disturbed that an African-American was blamed for the issue when his name never came up during any conversations she had regarding this matter.

55.     On August 20, 2019, Dr. Conley emailed Dr. Jenni Cardenas and told Dr. Cardenas she was informed that someone had talked to her about concerns Dr. Conley raised during the Faculty Senate Constituency meeting, that there were some inconsistencies and fabrications concerning what she had shared in the meeting, and asked Dr. Cardenas for the source of the misinformation so that she could address it personally to prevent any further misrepresentation of her statements.  Dr. Cardenas responded to Dr. Conley that she did not feel comfortable sharing the name of the person who came to her with the information.

56.     That same day (August 20, 2019), during a Faculty Senate meeting, a discussion regarding FERPA was held.  The minutes of that meeting stated, in pertinent part,

> FERPA waiver – can not require students to fill it out.  Very illegal – manipulation of that power to make students fill this out.  CAN NOT DO THIS.  Can not mandate or even suggest that they fill it out.  We can tell them that it exists, and that if they want to fill it out that is fine, but that is all.  It is located in Student Portal.

57.     Sometime after the August 20, 2019 Faculty Senate meeting, Dr. Conley contacted Heather Moulton, Faculty Senate President, and Dan Bradley, Faculty Senate Vice President, to express her concerns about the language in the August 20, 2019 meeting minutes regarding statements made by her during the August 12, 2019 Faculty Senate Constituency meeting regarding a FERPA waiver.  Dr. Conley told Ms. Moulton and Mr. Bradley that by misrepresenting what she said, the meeting minutes were falsely implying that she was acting in a way that was illegal or an abuse of power.  Dr. Conley asked Ms. Moulton and Mr. Bradley about correcting the verbiage in the meeting minutes.  Ms. Moulton responded that the language and forcefulness of the meeting minutes resulted from Academic Leadership and a meeting with Dr. Cardenas.  The Faculty Senate meeting minutes were not changed following Dr. Conley's request that they be corrected.  No other

non-African-Americans were similarly targeted, singled out, and misrepresented in minutes during Faculty Senate Constituency meetings.

58.     On August 24, 2019, Dr. Conley sent an email to CAC President, Dr. Elliott, requesting to meet with her (Dr. Elliott) and other Administrators (Dr. Jenni Cardenas (VP – Student Services), Dr. Mary Kay Gilliland (VP – Academic Affairs), Dr. Mary Kay Gilliland (VP – Academic Affairs), Dr. Sandra Rath (Diversity and Inclusion Advisory Council), Chief Greg Robert (Chief of Police), Dr. Derrick Span (Chair – Social and Behavioral Sciences), Chris Wodka (VP – Business Services), Brandi Bain (VP – Talent Development), Heather Moulton (Faculty Senate President), Michelle Young (Ombudsman), and Dr. Tramaine Rausaw (Dean Student Life)) to discuss unfair treatment of African-Americans at CAC and ways to build trust and relationships.  Dr. Elliott forwarded Dr. Conley's email to Ms. Young and wrote that this was not typically how issues or concerns were addressed and asked whether it should go to the Diversity Committee.  At the time, there was no process for sending complaints to the Diversity Committee as it had been newly formed.

59.     Ms. Young believed the only reason Dr. Elliott forwarded the email to her was because both she and Dr. Conley were African-American.

60.     Ms. Young responded to Dr. Elliott that she thought Dr. Conley wanted her concerns to be heard and encouraged Dr. Elliott to meet with Dr. Conley and hear her concerns.  Dr. Elliott scheduled a meeting with Dr. Conley, but later rescheduled it.  This happened three times.  Upon information and belief, many white employees have always had an open door to the President's Office to express concerns, which were promptly addressed and dealt with; however, Dr. Conley believes that because she was black, she was delayed and put through significantly more red tape to have her concerns heard.

61.     The meeting between Dr. Elliott and Dr. Conley finally occurred on October 9, 2019.  However, Dr. Elliott narrowed the list of attendees to Brandi Bain, Heather Moulton, Michelle Young, and Dr. Tramaine Rausaw.  During the meeting, Ms. Young, on behalf of Dr. Conley, discussed Dr. Conley's concerns regarding false statements made

by white faculty against Dr. Conley and the protection of the lies of a faculty member against Dr. Conley, an African-American, by Dr. Cardenas, an Administrator. The actions of Dr. Cardenas were defended by Dr. Elliott, and Dr. Conley was told to "deal with it, it happens."

62.    Ms. Young asked if CAC could look into the intent of the actions against Dr. Conley. Dr. Elliott told Dr. Conley that this was an issue that happened within the Faculty Senate and should be dealt with within the Senate. As a result of the meeting, it was decided that Dr. Elliott would speak with Dr. Cardenas, Dr. Cardenas would then speak with the person who reported the misinformation to her, and Dr. Cardenas would get back with Dr. Conley. Later, Dr. Conley heard back from Dr. Elliott that she "did her part." Dr. Conley never heard back from Dr. Cardenas, and she received no resolution of her concern.

63.    On or around October 14, 2019, Dr. Conley, while walking to her office, asked Sue Tatterson, Chair of the Visual and Performing Arts Division, how to print the word "Sample" across a document. Ms. Tatterson explained the process and Dr. Conley thanked her. Ms. Tatterson then asked to speak to Dr. Conley outside and motioned for Dr. Conley to follow her outside to the front of the instruction building (T-building). Outside, Ms. Tatterson told Dr. Conley that she heard through the "airways" that Dr. Conley had a problem with the salary increases of individuals with a Master of Fine Arts ("MFA") degree to the same salaries of individuals with a Ph.D. and that the salary increases were in no way a devaluation of a Ph.D. Ms. Tatterson then referred to Dr. Conley as a "bully" because Dr. Conley disagreed that a MFA degree was equivalent to a Ph.D. degree.

64.    Ms. Tatterson later contacted other individuals at CAC, but not Dr. Conley's chair and direct supervisor, Dr. Derrick Span, who is Black, and is Ms. Tatterson's peer. Elevating the matter to a higher level and not even contacting Dr. Conley's direct supervisor was clearly an effort to continue to disparage Dr. Conley and her reputation and was an abuse of power. There was an established protocol for handling these types

of matters at CAC, which was not followed.  No other non-African-American similarly situated employees were similarly treated.

65.    On or around November 6, 2019, Dr. Conley filed a grievance regarding her discriminatory/disparate treatment.  An outside investigator was hired by Human Resources to investigate Dr. Conley's claims.  The same external agency and investigator used to investigate the claims against Dr. Ross was hired to investigate Dr. Conley's claims.  During her investigations of Dr. Conley and Dr. Ross's grievances, the investigator, a White female, showed Dr. Conley, Dr. Ross, and several other African-American witnesses, pictures of her biracial daughter.  Dr. Conley was also inappropriately questioned during her interview by the investigator.  For example, she was asked if she knew the Black finalist for VP Student Services that Dr. Elliott did not select for hire.  On April 6, 2020, Dr. Conley was notified by Brandi Bain that the investigator concluded all of the allegations in her grievance were unfounded or not substantiated.

### 3.    Ms. Michelle Young

66.    In 2017, the Communications Academic Division was moved to the Social and Behavioral Sciences ("SBS") Division.  Prior to the move, Ms. Young was told that her position as lead faculty in the Communications Academic Division would transfer to the SBS Division.  It was also discussed that the Communications Department would possibly be its own division.  However, following the move, Ms. Young was allowed to finish her current contract (with one year left), but the promise of an additional faculty lead in the new Division was not honored, thus preventing Ms. Young the opportunity to continue as lead faculty in the SBS Division.  The move of the Communications faculty from the Communications Academic Division to the SBS Division also caused a discriminatory segregation and imbalance of faculty of color from other faculty at CAC. The move removed faculty of color from different divisions and concentrated them into a single division to isolate them from other divisions.

67.    On January 9, 2020, Ms. Young was informed in an email to her from the President of CAC, Dr. Elliott, Caucasian, that Dr. Elliott was removing her from her

position as Ombudsperson and opening the process for a new Ombudsperson.  Ms. Young had been serving as the Director of the Ombudsman Program at CAC since in or around April 2015, in addition to her regular position as Professor of Communication Studies.

68.     The January 9, 2020 email from Dr. Elliott stated that she had done some quick asking around and learned that CAC had "never had an open application process" for selecting an Ombudsperson, that the Ombudsperson role had "just been handed off to interested (trained) parties when the person in the role left or retired," that Ms. Young "took over" the position for Mary Menchaca when she retired, and that some of the past practices and lack of clarity and consistency at CAC had led to many of the perceptions of favoritism at CAC.

69.     Dr. Elliott went on in her email stating that to avoid perpetuating any perceptions of favoritism or preferential treatment, she "wanted to open up the ability to serve as Ombudsperson to others who may be interested", that she was going to adopt a process of selecting a new Ombudsperson every three years, and that Ms. Young could apply for the position.

70.     Prior to the January 9, 2020 email, several African-American employees had approached Ms. Young in her role as Ombudsperson to discuss their concerns about being treated unjustly because of their race.  Ms. Young felt that as a woman of color, her skill set and experience were being questioned without cause, and removing her from the Ombudsman role was Dr. Elliott's means to discourage future complaints from African-American employees.

71.     Dr. Elliott's statements in her email regarding how Ms. Young obtained her position as Director of the Ombudsman Program misstated not only the selection process for the Ombudsperson performed by the previous President of CAC to select Ms. Young for the position, but also Ms. Young's expertise and experience to do the job.  At the time of the retirement of the previous Ombudsperson, Mary Menchaca, a recommendation was made for a successor.  The recommended individual was not Ms. Young.  Later, several candidates were nominated for the position.  The previous President reviewed the resumes

of all the nominated candidates, which included Ms. Young, and then appointed a director based on the experience and knowledge of those candidates.  Ms. Young actually had no interest in the Ombuds role at the time, but after reviewing the resumes of the nominated candidates, the President asked Ms. Young to consider the role based on her experience in communications and conflict resolution.  Other individuals, in addition to Ms. Young, were considered for the role before the final decision was made.

72.    Soon after she began serving in the Ombudsman role, Ms. Young recognized the help and encouragement she provided other employees who were struggling with their employment-related concerns, including perceptions of unfair treatment and discrimination.

73.    Dr. Elliott's email also stated that she wanted "to review the stipend amount as it hasn't probably been reviewed for several years."  During the time Ms. Young served as Ombudsperson, she was paid a stipend of $7,000 per year for the Ombudsperson role.  Ms. Young did not receive any increase during her years of service despite performing additional duties for the Ombudsperson position outside the role of the Ombudsperson Program policy.  The stipend ended June 30, 2020, a significant decrease to Ms. Young's earnings.

74.    Ms. Young's position as Director of the Ombudsperson Program officially ended on June 30, 2020.  Prior to Ms. Young's involuntary removal from this position, no one had ever been involuntarily removed from this role.  At the time of Ms. Young's removal, she had served in the position for over five years.  Ms. Young replaced Mary Menchaca, who had been the previous director, for seven or eight years.  Ms. Menchaca only left the position due to her retirement.  Ms. Young was replaced as Director of the Ombudsperson Program by Armineh Noravian.  Neither Ms. Menchaca nor Ms. Noravian is African-American.

75.    Upon information and belief, Dr. Elliott wanted to remove Ms. Young from her role as Ombudsperson because there had been a number of concerns expressed by Ms.

Young and other African-American employees and students of CAC regarding discriminatory policies and practices against people of color at CAC.

76.     Upon information and belief, Dr. Elliott also wanted to remove Ms. Young from her role as Ombudsperson because during Ms. Young's employment at CAC she had been very vocal about needed changes to EEO policies and complaint processes which appeared discriminatory to African-Americans and other minorities.

77.     Additionally, upon information and belief, Dr. Elliott wanted to remove Ms. Young from her role as Ombudsperson because she had encouraged employees to file grievances according to policy when they felt violations had occurred.

78.     Ms. Young has observed during the time she served as Director of the Ombudsperson Program, a discriminatory pattern that when issues concerning African-Americans are raised, they are sent to a third party investigator for investigation.  She has observed this occurring on at least three occasions involving African-American employees.  In all three cases, they were all investigated by the same company and the same investigator.  The decisions by the investigator are final.  There is no appeal process.  Additionally, Ms. Young has observed that other complaints of discrimination not involving African-American employees are investigated internally.

79.     A demographic report from Institutional Research reported that in Fall 2019, of the 350 employees at CAC, 20 employees identified as Black/African-American.  This minority group is underrepresented throughout the College.  Currently there is only one African-American in administration.  Employees reported their concerns regarding the underrepresentation of Black/African-American employees at the College to Ms. Young when she was Director of the Ombudsperson Program, Talent Development (Human Resources), Constituency Associations, and Vice President's and administrators of the College.  However, nothing effective has been done regarding these complaints, nor have there been any efforts to improve hiring or retention of African-American employees.  Due to unwelcoming practices and the current work environment at CAC, CAC is not able to

retain people of color and there is a high turnover when compared to Caucasian employees.

80.    Ms. Young has observed during the time she served as Director of the Ombudsperson Program, that in 2018, an African-American student was assaulted by a Police Officer on campus.  This incident led to national concern for how CAC handled these types of incidents.  The Campus Climate Committee, of which Ms. Young was a member, met with the College President and made recommendations for a Diversity Committee to be created which could help address such issues and serve as an Advisory Council to the President.  The President agreed to the Committee, but refused to have it linked in any way to her office.  Since the inception of this committee, there has been little interaction with the committee by administration and little support.

81.    Members of the Campus Climate Committee and Diversity and Inclusion Committee have been characterized as troublemakers, irrational, and emotional when it comes to raising awareness about issues of diversity and inclusion at CAC.  This has created a hostile work environment for African-American and members at large on these committees.

82.    In 2020, the President created a separate Equity Committee, subverting the previous committee and its members.  The new Equity Committee, in its initial charter, limited the people of color from participating, identified members of the Guided Pathway Committee (mostly Caucasian) for membership, and is now chaired by the President.  This action has undermined the previous Diversity and Inclusion Committee and both the Equity Committee and Diversity and Inclusion Committee appear to have overlapping missions.

83.    Additionally, Ms. Young has observed during the time she served as Director of the Ombudsperson Program, that the Diversity Committee's actions have included the proposal of a Chief Diversity Officer, recommending diversity training for the College and faculty, and creating a Faculty Affirmative Action task force to help address similar concerns.  Administration has continuously met these recommendations

with resistance.   Comments have been made by administrators that this topic is too controversial to address and the Committee should try to take on smaller actionable items. There was also faculty resistance to the diversity proposals citing "affirmative action is illegal" and "micro-aggressions are subjective."  The Faculty Senate President stated again that these were "personal" issues which should be dealt with personally and she would not allow concerns from protected class members of the faculty to be brought forth to the Senate Constituency.

84.     Ms. Young has also observed during the time she served as Director of the Ombudsperson Program, that several employees of color filed grievances related to discrimination detailing feelings of intimidation, unfounded probationary and performance issues, and alleged retaliatory actions.  There also have been corroborative statements gathered from people of color which were shared with administration.  These grievances and statements were characterized as "tales", personal issues, and an invalidation of experiences.  There is a perception by Administration that there is no value or truth to the experiences of people of color.

85.     On April 7, 2020, an executive meeting of the Faculty Senate was held to discuss implementing an Affirmative Action taskforce proposal.  Ms. Young was invited to attend the meeting as the Director of the Ombudsman Program.  During the meeting, it was apparent that members of the Senate and the Senate leadership were not in support of the taskforce proposal.  In the meeting the Senate President stated that the Senate bylaws did not support issues of race.  Ms. Young and others complained to the Faculty Senate and the Faculty Senate President regarding their concerns of the interpretation of the bylaws, but no changes were made at that time to the position taken that race discrimination towards faculty were personal problems.   Later, the Faculty Senate President, who is not African-American, defended her position publicly by stating that this was the way she interpreted the bylaws of the Faculty Senate and that after her term was over, the next Faculty Senate President was free to interpret the bylaws differently if they wished.  Accordingly, faculty of color have not been able to go to the Faculty Senate

to share concerns of discrimination, because the President of the Senate has deemed concerns of race discrimination a "personal" issue not to be dealt with or heard by the Senate.  This issue was brought to mediation by faculty of color for resolution.

86.     Ms. Young and other faculty shared their concerns regarding race discrimination towards faculty with the Dean of her department and the VP of Academics to no avail.  Nothing effective has been done to change policies and procedures for making complaints of discrimination.

87.     In Fall 2020, CAC created names for division pathways for students.  The Social and Behavioral Sciences Division where CAC concentrated African-American employees was color coded as the "brown" division.  This created a distinct separation and hostile work environment for the faculty of color in that division.

88.     On October 1, 2020, Ms. Young filed a charge of discrimination, Charge No. 540-2021-00030, with the EEOC against Defendant CAC alleging race and color discrimination, hostile work environment, and retaliation for a class of African-American employees' complaints of race and color discrimination.

89.     On January 29, 2021, the EEOC issued Ms. Young a Notice of Right to Sue.

90.     Plaintiffs have timely filed this lawsuit.

**COUNT I**

**(Violation of Title VII of the Civil Rights Act of 1964, as amended)**

91.     All previous paragraphs of this Complaint are realleged as if set forth more fully herein.

92.     The acts, policies, and practices of CAC, as alleged herein above, violate Title VII of the Civil Rights Act of 1964, as amended, and created a hostile, discriminatory, and disparate work environment for Ms. Young.

93.     Ms. Young was subjected to a hostile work environment and repeated acts of discrimination while employed with CAC which were objectionable to her and which would have been objectionable to any reasonable person and which altered the work environment in such a way as to constitute a hostile work environment.

94.     CAC discriminated against Ms. Young because of her race and color in violation of 42 U.S.C. § 2000e-2(a) by engaging in, tolerating, or failing to prevent the discrimination described above, by failing to take affirmative action to timely stop the unlawful employment practice, and by otherwise discriminating against Ms. Young.

95.     The effect of CAC's unlawful race and color discrimination has been to classify, limit, and discriminate against Ms. Young in a way that jeopardizes and tends to deprive her of her employment opportunities and otherwise affect her status as an employee because of her race and color, which violates Title VII of the Civil Rights Act of 1964, as amended.

96.     Ms. Young, a victim of CAC's unlawful employment practices has suffered humiliation, degradation, and other non-monetary benefits solely because of her race and color.  Upon information and belief, Ms. Young has suffered loss of income in the form of past, present, and future wages as a result of CAC's unlawful employment practices.

97.     Ms. Young is entitled to recover from CAC relief as authorized by 42 U.S.C. § 1981a and reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 2000e-5(k).

## COUNT II

**(Retaliation in Violation of Title VII of the Civil Rights Act of 1964, as amended)**

98.     All previous paragraphs of this Complaint are realleged as if set forth more fully herein.

99.     Ms. Young was subjected to retaliation by CAC in direct contravention of 42 U.S.C. § 2000e-3(a).

100.    CAC retaliated against Ms. Young because of her complaints about her discriminatory treatment and the discriminatory treatment of other African-American employees by removing job duties and pay.

101.    The effect of CAC's unlawful retaliation has been to classify, limit, and discriminate against Ms. Young in a way that jeopardizes and tends to deprive her of her employment opportunities and otherwise affect her status as an employee because of her protected activities, which violates Title VII of the Civil Rights Act of 1964, as amended.

102.   Ms. Young, a victim of CAC's unlawful employment practices has suffered humiliation, degradation, and other non-monetary benefits solely because of her protected activities.   Upon information and belief, Ms. Young has suffered a loss of income in the form of past, present, and future wages as a result of CAC's unlawful employment practices.

103.   Ms. Young is entitled to recover from CAC relief as authorized by 42 U.S.C. § 1981a and reasonable attorneys' fees and costs as authorized by 42 U.S.C. § 2000e-5(k).

### COUNT III

### (Violation of 42 U.S.C. § 1981)

104.   All previous paragraphs of this Complaint are realleged as if set forth more fully herein.

105.   Under 42 U.S.C. § 1981, all persons, within the jurisdiction of the United States, regardless of race, shall have the same right in every state to make and enforce contracts and enjoy all benefits, privileges, terms, and conditions of the contractual relationship.

106.   As more fully described above, CAC subjected the Plaintiffs to a hostile work environment and intentionally discriminated against Dr. Ross, Dr. Conley, and Ms. Young on the basis of their race and color and retaliated against them for complaining about and opposing racial discrimination in the workplace.   CAC's discriminatory and retaliatory actions were directed to impinge Dr. Ross, Dr. Conley, and Ms. Young's right to make and maintain their contractual employment relationships with CAC.

107.   As a result of CAC's actions, Dr. Ross, Dr. Conley, and Ms. Young have sustained damages and are entitled to recover back pay, reinstatement, or in lieu of reinstatement, front pay and compensatory damages for pain and suffering and emotional distress.

108.   Dr. Ross, Dr. Conley, and Ms. Young are also entitled to recover their reasonable attorneys' fees and costs under 42 U.S.C. § 1988.

**WHEREFORE,** Plaintiffs request that this court enter judgment in their favor and against the Defendant as follows:

A.     Declare that the employment practices complained of in this Complaint are unlawful and that they violate 42 U.S.C. §§ 2000e-(2)a and 2000e-3(a), 42 U.S.C. § 1981, the state statutory and common law claims asserted in this Complaint;

B.     Order Defendants to pay Plaintiffs' actual damages in an amount to be proven at trial;

C.     Order Defendants to pay Plaintiffs their economic and non-economic damages and losses including lost wages, back pay, front pay, and other monetary and non-monetary benefits, all amounts to be proven at trial;

D.     Order Defendants to pay Plaintiffs' general and compensatory damages for their economic losses, pain and suffering, emotional distress, harm to reputation and loss of earning capacity, and all special damages or financial losses that Plaintiffs have suffered in an amount to be proven at trial;

E.     Award Plaintiffs prejudgment interest from the date each claim for damages was liquidated;

F.     Award Plaintiffs prejudgment interest on all liquidated sums and interest on all sums awarded in judgment at the highest legal rate allowable from the date of judgment until paid;

G.     Award Plaintiffs interest on all sums awarded in judgment at the highest legal rate allowable from the date of judgment until paid;

H.     Order Defendant to pay Plaintiffs' court costs, expenses, and reasonable attorneys' fees in connection with this action pursuant to all applicable federal and state statutes;

I.     For Plaintiffs' continuing costs in this matter; and

J.     For such other and further relief as this court deems just and proper under the circumstances.

1

## DEMAND FOR JURY TRIAL

2         Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby

3    demand a jury trial.

4

5         **DATED** this 28th day of April, 2021.

6                              **JACKSON WHITE**

7

8                               s/ Michael R. Pruitt

9                              By:    Michael R. Pruitt, SBN 011792
                                      Nathaniel J. Hill, SBN 028151
10                                    Grant S. Cragun, SBN 034332
                              40 North Center Street, Suite 200
11                            Mesa, Arizona   85201
                              *Attorneys for Plaintiffs*
12

13   F:\VWXYZ\Young, Michelle\Pleadings\Complaint.docx

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28